**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSEPH BIFANO and<br>KEITH RYNEARSON,** | : | |
| | : | |
| **Plaintiffs,** | : | **CIVIL ACTION NO. 3:16-0245** |
| | : | |
| **v.** | : | **(JUDGE MANNION)** |
| | : | |
| **WAYMART BOROUGH and<br>FREDERICK J. GLAVICH,** | : | |
| | : | |
| **Defendants.** | : | |

# M E M O R A N D U M

Pending before the court is a motion to dismiss, (Doc. 8), filed by defendant Waymart Borough located in Wayne County, Pennsylvania ("the Borough") and defendant Frederick J. Glavich ("Police Chief Glavich"). The defendants seek dismissal of all of the claims in the complaint, (Doc. 1), filed by plaintiff Joseph Bifano ("Corporal Bifano") and plaintiff Keith Rynearson ("Sergeant Rynearson"). Corporal Bifano and Sergeant Rynearson were former employees of the Borough's police department. The plaintiffs' complaint alleges that the Borough and Police Chief Glavich violated Pennsylvania's whistleblower law (Count I) and the First Amendment of the United States Constitution (Count II). The complaint also alleges that Police Chief Glavich defamed the plaintiffs under Pennsylvania law (Count III). For the reasons that follow, the defendants' motion to dismiss is **GRANTED IN PART and DENIED IN PART**.

## I.   FACTUAL BACKGROUND[1]

Corporal Bifano began working for the Borough's police department in 2007. Sergeant Rynearson joined the department in 2009. Both possessed full-time jobs in addition to their time spent with the department. In October 2010, Police Chief Glavich accepted the role of chief of police; the plaintiffs had been offered this position first but turned it down. Unlike the previous police chief, Police Chief Glavich frequently sat in the office "on duty" (1) "in plain clothing"; (2) "with his personal vehicle outside and/or without [a] police vehicle available"; (3) "avoid[ing] telephone calls"; and (4) "at times, would avoid citizen complaints attempted in person." (Doc. 1, at ¶¶16–17). Police Chief Glavich was billing the Borough during those times he was in the office and allegedly "on duty." Police Chief Glavich also used department funds to purchase equipment "sparingly, and unreasonably," including the purchase of less expensive radios for the department. These less expensive radios lost connectivity after a few hundred yards. (*Id*. ¶¶18–19). Police Chief Glavich would also criticize the plaintiffs about their enthusiasm for enforcing the law. (*Id*. ¶20).

---

[1] All facts are taken from the plaintiffs' complaint, (Doc. 1), unless otherwise noted. The facts alleged in the complaint must be accepted as true in considering the defendants' motion to dismiss. *See Dieffenbach v. Dept. of Revenue*, 490 F. App'x 433, 435 (3d Cir. 2012); *Evancho v. Evans*, 423 F.3d 347, 350 (3d Cir. 2005).

In March 2015, the plaintiffs met with the Borough's mayor at the time, Jack Millard ("Mayor Millard"); the Borough's councilman, Doug Bayly ("Councilman Bayly"); and the Borough's councilwoman, Lillian Rollinson ("Councilwoman Rollinson"). Another police department employee, Harry Shaffer ("Patrolman Shaffer"), was also in attendance. During this meeting, the plaintiffs were asked about Police Chief Glavich's work performance. (*Id*. ¶¶21–22). The plaintiffs told Mayor Millard, Councilman Bayly, and Councilwoman Rollinson about Police Chief Glavich's conduct in the office and his "wrongdoing and/or waste of public money and funding." (*Id*. ¶23). Job descriptions for officers and the chief of police were drafted for the department as a result of this meeting. The newly implemented job description included a requirement that Police Chief Glavich record all hours he claimed to be "on duty." Police Chief Glavich signed this job description on April 17, 2015. However, the plaintiffs later spoke to the Borough's treasurer, Shelly Gologski ("Treasurer Gogolski"), and she said that Police Chief Glavich was "billing a lot," despite never seeing him. (*Id*. ¶¶24–28).

At the end of the 2015 summer Mayor Millard and Councilman Bayly asked Corporal Bifano about Police Chief Glavich's performance since the meeting; Corporal Bifano responded that things were "status quo." (*Id*. ¶¶29–30). After this encounter, Mayor Millard planned to confront Police Chief Glavich during a meeting. Before the meeting was to be held, however, Councilman Bayly told Police Chief Glavich about the meeting's underlying

purpose. The meeting was cancelled and Mayor Millard subsequently resigned as mayor because he was "so upset by this turn of events." (*See id.* ¶¶32–34).

During the Labor Day weekend, a fireman approached Corporal Bifano and told him that he did not have authority to break up gatherings. Corporal Bifano called Police Chief Glavich about the matter and Police Chief Glavich accused Corporal Bifano of "talking behind his back." (*Id*. ¶¶35–36). On September 8, 2016, the Borough held a monthly meeting with Police Chief Glavich and Patrolman Shaffer in attendance. During that monthly meeting Police Chief Glavich held an executive, closed-door meeting with the Borough's councilmembers. The next day, the plaintiffs were placed on unpaid suspension due to an alleged lack of funding, despite there being sufficient funding for their continued service. (*Id*. ¶¶38–45).

Another meeting was scheduled for October 20, 2015 to discuss the plaintiffs' suspension. This meeting turned into a hostile confrontation between the plaintiffs and the Borough's councilmembers where the councilmembers accused the plaintiffs of violating the chain of command. Afterwards, the plaintiffs were not placed back on the schedule and they declined to attend any more meetings. (*Id*. ¶¶46–53). Instead, they sought a return to duty "upon the acceptance of a few requests," which the defendants denied. (*Id*. ¶¶54–55). After this, the defendants took a series of actions in addition to the suspension. In October 2015, the Borough's new mayor, Chip

4

Norella ("Mayor Norella"), implemented a policy of single person patrols which would have prevented the plaintiffs from working together while on duty. On November 18, 2015, the plaintiffs were required to return all of their equipment. On December 8, 2015, the plaintiffs' ranks and titles were eliminated. On January 5, 2016, the plaintiffs were officially terminated. (*Id*. ¶¶57–60).

At some point during this series of events, Police Chief Glavich told the Borough's councilmembers that the plaintiffs had "violated the [c]hain of [c]ommand." (*Id*. ¶62). Meanwhile, the plaintiffs were seeking employment in police departments located in neighboring municipalities. The Forest City police department was a neighboring municipality. At some unspecified time, Police Chief Glavich also told the chief of police of the Forest City police department that Sergeant Rynearson violated the chain of command. (*Id*. ¶¶62–64). Police Chief Glavich's statement to the Forest City chief of police was made voluntarily and not as a result of any request. (*Id*. ¶111).

## II.   PROCEDURAL BACKGROUND

On February 11, 2016, the plaintiffs initiated this civil rights action. In Count I, the plaintiffs alleged that the defendants violated Pennsylvania's Whistleblower Law, 43 PA. STAT. ANN. §1421 *et seq*. by retaliating against them after they spoke out against Police Chief Glavich. In Count II, the plaintiffs alleged that the defendants' retaliatory actions violated the First

5

Amendment. This claim was brought under Title 42, Section 1983 of the United States Code. In Count III, the plaintiffs alleged that Police Chief Glavich's statements to others that the plaintiffs violated the chain of command was defamatory.

On March 16, 2016, the defendants filed the current motion to dismiss based on Federal Rule of Civil Procedure 12(b)(6) and the plaintiffs' purported failure to state any claims. (Doc. 8). Attached to their motion as an exhibit was a letter from the plaintiffs' attorney to the solicitor of the Borough. (Doc. 8, Ex. B). This letter detailed the "requests" the plaintiffs made to the Borough before they would agree to return to the police department. This letter was referenced in the plaintiffs' complaint but was not attached. (*See* Doc. 1, at ¶54). The defendants request that the court consider the letter in deciding the motion. The motion has been fully briefed and is now ripe for review.

## III.   STANDARD OF REVIEW

### A. Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. In reviewing such a motion, the court must "accept all factual allegations as true, construe the [c]omplaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the [c]omplaint, the plaintiff may be entitled to relief." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116,

120 (3d Cir. 2012) (internal quotation marks and citation omitted). It is the moving party that bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

Dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007). This "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Ultimately, the plaintiff must be able to "provide the grounds of his entitlement to relief," requiring more than bold-faced labels and conclusions. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (brackets and internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555). "[A] formulaic recitation of the elements of a cause of action will not do." *Id*.

The Third Circuit Court of Appeal has announced a three part inquiry to apply the pleading principles announced in *Iqbal* and *Twombly*.

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013). Lastly, the court should grant leave to amend a complaint before dismissing it as

7

merely deficient. *See, e.g.*, *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007); *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *Shane v. Fauver*, 213 F.3d 113, 116-17 (3d Cir. 2000). "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." *Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004).

### B. The Defendants' Attached Exhibit

As an initial matter, the court must determine if the exhibit attached to the defendants' motion to dismiss should be taken into consideration. The parties spent considerable time briefing this issue, relative to other arguments. The court will not consider the letter as it is improper and unnecessary to the court's finding under Rule 12(b)(6).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. *See Sands v. McCormick*, 502 F.3d 263 (3d Cir. 2007). The court may, however, consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." *Pryor v. Nat'l*

8

*Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002) (quoting 62 Fed. Proc., L. Ed., §62:508). The court may not rely on other parts of the record in determining a motion to dismiss. *See Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).

If a defendant attaches a document to a motion to dismiss the court must decide if it may properly consider the document in a Rule 12(b)(6) motion or if it converts the motion into a motion for summary judgment under Federal Rule of Civil Procedure 56.[2] *See Miller v. Clinton County*, 544 F.3d 542, 550 (3d Cir. 2008). In *Miller*, the Third Circuit determined that a letter attached to the defendant's motion to dismiss should have been considered in analyzing the sufficiency of the plaintiff's First Amendment retaliation claim. *Id*. The letter formed the basis of the speech that the plaintiff sought protection for, thus the plaintiff's claims "were undisputably based on her . . . letter." *Id*.

The letter attached to the defendants motion does not form the basis of the plaintiffs' claims. The plaintiffs seek (1) First Amendment and state law protection for oral statements made to Mayor Millard and the Borough's councilmembers regarding Police Chief Glavich's performance and (2) protection against alleged defamatory statements made by Police Chief Glavich to others about the plaintiffs. The attached letter lists the "requests"

---

[2] The defendants have not argued that the letter converts the motion into a motion for summary judgment.

made by the plaintiffs after their suspension but before they would return to the police department. (*See* Doc. 1, at ¶54). Unlike the document in *Miller*, the requests detailed in the letter do not form the basis of the plaintiffs' defamation or retaliation claims and may not be considered in a Rule 12(b)(6) motion to dismiss.

The letter is also unnecessary to the court's analysis. The letter may speak to the underlying motives for the defendants' actions in ultimately terminating the plaintiffs. Thus, the letter is evidence supporting a likely defense to this retaliation action—indicating a possible lack of retaliatory motive. The letter does not, however, speak to the issue of whether the plaintiffs have stated a claim in the first instance. The defendants seem to recognize as much because, although they devote considerable time briefing this issue, the defendants' legal arguments for dismissal do not actually reference or make use of the letter. Therefore, not only would it be improper under Rule 12(b)(6)'s standard of review to consider the attached letter, it is unnecessary to do so in light of the defendants' substantive arguments before the court.

## IV.   DISCUSSION

### A. The Plaintiffs' First Amendment Retaliation Claim—Count II[3]

In Count II of the complaint the plaintiffs allege that the Borough and Police Chief Glavich retaliated against them in violation of the First Amendment for speaking to Mayor Millard and the Borough councilmembers about Police Chief Glavich's performance as chief of police. Specifically, the plaintiffs allege that the defendants actions in suspending them, removing their rank, removing their ability to work together, and terminating them constituted retaliation for their protected speech. The defendants argue that the statements made by the plaintiffs were related to their official duties, were not made as private citizens, and are, therefore, not protected. In addition, the defendants argue that the complaint has not established causation between the defendants' acts and the plaintiffs' speech. Lastly, the defendants argue that Police Chief Glavich is entitled to qualified immunity. The court agrees, in part. Particularly, the plaintiffs' allegation that Police Chief Glavich purchased less expensive equipment does not state a valid First Amendment retaliation claim. The court also agrees that Police Chief Glavich is entitled to qualified immunity. The defendants' motion is granted in this respect. The

---

[3] The court first addresses the defendants' arguments as they relate to the First Amendment claim (Count II), as this claim is the only one invoking the court's original jurisdiction under 28 U.S.C. §1331.

11

defendants' motion is denied with respect to the plaintiffs remaining allegations against the Borough.

The Supreme Court has long established that a citizen's ability to participate in free debate on matters of public importance is "the core value of the Free Speech Clause of the First Amendment." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 573 (1968); *see also Connick v. Myers*, 461 U.S. 138, 145 (1983); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982). While a citizen who enters government service must forfeit the scope of some of his freedoms, he is "nonetheless a citizen" who deserves protection from restriction of liberties he enjoys in his capacity as a private citizen. *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). "[A] public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Baldassare v. New Jersey*, 250 F.3d 188, 194 (3d Cir. 2001) (citing *Rankin v. McPherson*, 483 U.S. 378, 383–84 (1987)). Thus, "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419.

In order to establish a First Amendment retaliation claim in this circuit, a public employee must show (1) that his or her speech is protected by the First Amendment and (2) that the speech was a substantial or motivating factor of the employer's retaliatory action(s). *Flora v. County of Luzerne*, 776

F.3d 169, 174 (3d Cir. 2015) (citing *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009)). "The first factor is a question of law; the second factor is a question of fact." *Gorum*, 561 F.3d at 184 (quoting *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006)). If these two elements are established, the burden shifts to the employer to show that it would have taken the same action regardless of the speech. *Flora*, 776 F.3d at 174; *id*. The court finds that the plaintiffs' have sufficiently pled the first two required elements in their First Amendment retaliation claim as it relates to some, but not all, of the plaintiffs' speech against Police Chief Glavich.

## I.   *The Protected Speech Requirement*

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. A public employee's speech is only protected when "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he [or she] made." *Flora*, 776 F.3d at 175 (quoting *Garcetti*, 547

U.S. at 418). The defendants only challenge the first prong of this three-part inquiry, but the court will address each in turn.

Whether a public employee is speaking as a citizen turns upon the question of "whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014). Importantly, the Supreme Court and the Third Circuit Court of Appeals have clarified that the test should not be whether the speech "concerns" or was "related to" those duties. *Id.* at 2379; *Flora*, 776 F.3d at 178–79. The inquiry is a mixed question of law and fact; "the scope and content of [the public employees] . . . job responsibilities is a question of fact, but the ultimate constitutional significance of those facts is a question of law." *Flora*, 776 F.3d at 175.

There is no "comprehensive framework" for defining the scope of an employee's duties. *Garcetti*, 547 U.S. at 424.

> The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id*. at 424–25. In *Lane v. Franks*, the Supreme Court found that grand jury testimony given by a supervisor about a subordinate employee who was

14

indicted for mail fraud and theft of receiving federal funds was citizen speech. 134 S. Ct. at 2380. The employee's testimony included statements that the subordinate employee performed "virtually no services," "generated virtually no work product," and "rarely even appeared for work." *Id*. at 2375. The Supreme Court determined that this testimony was protected even though the information underlying the testimony was gathered due to the speaker's role as supervisor. *Id*. at 2375, 2380. In their reasoning, the Supreme Court focused on the manner of the speech as sworn testimony and found that such testimony fell outside the ordinary responsibilities of the supervisor. *Id*. at 2379. The Supreme Court also "recognized that speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Id*. at 2379.

Here, there is nothing to indicate that Corporal Bifano's and Sergeant Rynearson's ordinary job responsibilities included going to the mayor and the Borough's councilmembers to report on the activities of the chief of police. Looking at the complaint and the defendants' own arguments, there is no indication that the plaintiffs were responsible for reporting potential wrongdoing. Thus, the court cannot conclude that this activity fell within their ordinary job responsibilities.

Section 1123.1(a)–(b) of Pennsylvania's Borough Code, 8 PA. CONS. STAT. ANN. §101 *et seq*. gives the Borough's mayor full power and control over the police force. These provisions do not dictate whether or not subordinate police officers are required to speak to the mayor on certain matters. The court compares these provisions to those cited in *Tayoun v. City of Pittston*, 39 F. Supp.3d 572 (M.D. Pa. 2014). There the court looked to Pennsylvania's Third Class City Code to definitely establish that the plaintiff officer's job responsibilities included reporting to the mayor. 39 F. Supp.3d 572, 579 (M.D. Pa. 2014). In contrast, the Borough Code does not detail a subordinate officer's job responsibilities.

The fact that the plaintiffs also spoke to councilmembers suggests that the plaintiffs were speaking as citizens and not as officers. The councilmembers were not part of the plaintiffs' chain of command and it is not alleged that they owed them any duty of reporting. *Cf. Foraker*, 501 F.3d at 243 (finding a trooper's speech unprotected by the Petition Clause where the trooper had a "duty" to report to an outside auditor due to an executive order). Construing the allegations in the plaintiffs' favor, the plaintiffs' speech to Mayor Millard and the councilmembers plausibly falls outside of the plaintiffs' ordinary job duties.

The defendants' argument primarily focuses on the fact that the plaintiffs' statements were made to Mayor Millard, who was "within" their chain of command. *(*Doc. 13*, at ¶12)*. However, whether the plaintiffs spoke within

16

or outside the chain of command is not the right inquiry and is not dispositive. *See Foraker v. Chaffinch*, 501 F.3d 231, 241 (3d Cir. 2007), *abrogated in part by Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379 (2011). The appropriate inquiry is whether or not they were expected, pursuant to their ordinary job duties, to report to the mayor. *Lane*, 134 S. Ct. at 2379; *id*.

Also, in light of *Lane*, the defendants' argument that the plaintiffs' complaints are not protected because the statements "relate solely to matters within the scope of [the plaintiffs'] duties" and "addressed issues about which Plaintiffs became aware solely by virtue of their positions as [p]olice [o]fficers" is not helpful. (Doc. 13 at 12). As explained by the Supreme Court, the fact that the plaintiffs became aware of Police Chief Glavich's performance issues by virtue of their positions as police officers does not automatically mean that their speech is unprotected. *See Flora*, 776 F.3d at 177–78. *Lane* clarifies that the appropriate inquiry in distinguishing between unprotected employee speech and protected citizen speech is "whether the speech at issue is itself ordinarily within the scope of [the] employee's duties." 134 S. Ct. at 2379. Whether the issues raised by the plaintiffs relate to or concern their job duties is no longer the appropriate inquiry. *Id.* at 2379; *Flora*, 776 F.3d at 178–79. As explained above, the defendants have not shown that reporting to Mayor Millard and the Borough's councilmembers was part of the plaintiffs' ordinary job duties. Thus, dismissal on this ground is not warranted.

The court briefly turns to the second and third prong of the protected speech requirement. Addressing the first prong, the court finds that the plaintiffs' statements about Police Chief Glavich implicated some matters of public concern. Addressing the second prong, the court finds that further discovery is required to determine if the defendants had "'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he [or she] made.'" *Flora*, 776 F.3d at 175 (quoting *Garcetti*, 547 U.S. at 418).

If an employee is speaking as a citizen, the Supreme Court has outlined when such speech is of public concern for First Amendment purposes:

> Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.

*Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal quotations omitted). When conducting this inquiry, the court must examine "the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48. No one factor is dispositive, and the court must take care to "evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Snyder*, 562 U.S. at 454; *Miller*, 544 at 550 ("We can not 'cherry pick' something that may impact the public while ignoring the manner and context in which that statement was made or that public concern expressed.").

18

"[S]peech that relates solely to mundane employment grievances does not implicate a matter of public concern." *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 467 (3d Cir. 2015). In contrast, "speech may involve a matter of public concern if it attempts to bring to light actual or potential wrongdoing . . . on the part of government officials." *Baldassare*, 250 F.3d at 195. Also, "governmental inefficiency and misconduct is a matter of considerable significance," G*arcetti*, 547 U.S. at 425, and "misuse of state funds . . . obviously involves a matter of significant public concern," *Lane*, 134 S. Ct. At 2380.

Here, the content and context of the plaintiffs' speech indicate that the plaintiffs' speech involved some matters of public concern. The plaintiffs informed Mayor Millard and the Borough's councilmembers of Police Chief Glavich's "wrongdoing and/or waste of public money and funding." (Doc. 1, at ¶23). Specifically, they informed them that Police Chief Glavich frequently sat in the office (1) "in plain clothing"; (2) "with his personal vehicle outside and/or without [a] police vehicle available"; (3) "avoid[ing] telephone calls"; and (4) "at times, would avoid citizen complaints attempted in person," during times he was billing the Borough for his services as police chief. (*Id*. ¶¶17–18). All of these factual statements amount to a single allegation that Police Chief Glavich was being compensated by the Borough while not performing his expected job duties.

The plaintiffs' statements relating to Police Chief Glavich's work performance while "on duty" are very similar to the statements made by the plaintiff in *Lane*, though not in the context of a criminal investigation. They concern the use of public funds to pay a public employee who is not actually performing his job duties. *See Lane*, 134 S. Ct. at 2375. The court will not cherry-pick each statement individually and, instead, views those statements as a whole. Accepting the complaint allegations as true, the plaintiffs were plausibly speaking on matters of public concern. Certainly, a police chief avoiding police department calls and citizen complaints while billing the Borough might indicate some wrongdoing or abuse of public office. After further discovery, the court will be able to evaluate "the content, form, and context of a given statement, as revealed by the whole record," and make a final determination. *Connick*, 461 U.S. at 147–48. At this stage, the court simply finds that the plaintiffs have alleged enough facts to plausibly meet this requirement.

The plaintiffs also criticized Police Chief Glavich for "us[ing] Police Department funds to purchase equipment sparingly, and unreasonably." (Doc. 1, at ¶19). This appears in a separate allegation in the plaintiffs' complaint, disconnected from the discussion regarding Police Chief Glavich's "on-duty" conduct. This allegation does not plausibly relate to any matter of public concern. Instead, this complaint was a personal grievance against Police Chief Glavich based on the fact that some of the equipment was not as good

20

as it could be. Particularly, the radios purchased "lost connectivity after a few hundred yards." *Id*. This type of complaint is akin to an unprotected, public employee grievance; thus, it is unprotected by the First Amendment. *See Munroe*, 805 F.3d 454, 467.

At this stage, the court cannot determine the third prong of the protected speech requirement. The third prong requires a court to analyze whether or not "the government . . . [lacked] an adequate justification for treating the employee differently than the general public based on its needs as an employer under the *Pickering* balancing test." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 987 (3d Cir. 2014) (internal quotations omitted); *see also Flora*, 776 F.3d at 175. The *Pickering* balance test requires that the court "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. "In performing this balancing, the manner, time, place, and entire expression of the context of the expression are relevant." *Swartwelder v. McNeilly*, 297 F.3d 228, 235 (3d Cir. 2002).

Specifically, a plaintiff's interest as a citizen as well as the public's interest in the speech must be balanced against the government's interest "as an employer, in promoting workplace efficiency and avoiding workplace disruption." *Dougherty*, 772 F.3d at 991 (internal quotation omitted). The balancing process requires "a fact-sensitive and deferential weighing of the

21

government's legitimate interests." *Swartzwelder*, 297 F.3d at 235 (quoting *Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 677 (1997)). This governmental interest may include "whether the statement impairs discipline by supervisors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388. In the law enforcement context, the government generally has a stronger interest in regulating employee speech. *See Ober v. Evanko*, 80 F. App'x 196, 200–201 (3d Cir. 2003). However, "a stronger showing [of government interests] may be necessary if the employee's speech more substantially involve[s] matters of public concern." *Lane*, 134 S. Ct. at 2381 (quoting *Connick*, 461 U.S. at 152) (alteration in original).

Here, any attempt to balance interests is premature. *Compare with Hill*, 455 F.3d at 243 (indicating an unwillingness to discuss the prong three analysis at the motion to dismiss stage of the case). The defendants' have not argued what interest they have in suppressing the plaintiffs' speech in the specific context of the Borough's police department and the court will not speculate. Without any assertion or demonstration of a government interest, the balance tips in the plaintiffs' favor. *See Lane*, 134 S. Ct. at 2381. Thus, at this stage the plaintiff's have asserted sufficient facts to meet the protected speech requirement in their First Amendment retaliation claim as it relates to

Police Chief Glavich's "on duty" conduct. They have not asserted a claim as it relates to Police Chief Glavich's purchase of equipment for the department because this conduct did not involve a matter of public concern.

### ii. *The Causal Link Between the Plaintiffs' Speech and the Defendants' Retaliatory Conduct*

The defendants next contend that the plaintiffs are unable to establish the causation element for their First Amendment retaliation claim because a span of five (5) months separated the plaintiffs' first set of statements and the first retaliatory action against them, their suspension. The court disagrees.

A public employee must show that [his or her] speech was a substantial or motivating factor in the employer's retaliatory action(s). *Flora*, 776 F.3d at 174. This second factor presents a question of fact typically left for a jury. *Gorum*, 561 F.3d at 184; *see also McGreevy v. Stroup*, 413 F.3d 359, 366 (3d Cir. 2005). At this early stage, the court must simply determine if, under any reasonable reading of the complaint, there exists a plausible inference of causation. *See Fleisher*, 679 F.3d at 120. The court finds the plaintiffs' complaint sufficient in this respect.

"To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel.*

*Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). "[T]he decisionmakers [responsible for the retaliatory action(s)] must be aware of the protected conduct." *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002). Thus, the span of time to establish temporal proximity is measured between the time of the defendant(s) learning of the protected conduct and the time of the retaliatory action taken. *See id.* at 494.

It is unclear from the plaintiff's complaint when Police Chief Glavich first learned about the plaintiffs' statements criticizing his job performance, making it impossible to calculate the span of time needed to infer causation using a timeline alone. Accepting all the facts pled in the complaint as true, the only timeline suggested by the plaintiffs is as follows:

(1) In May 2015, the plaintiffs made statements about Police Chief Glavich to Mayor Millard and "others"—presumably referencing Patrolman Shaffer, Councilman Bayly, and Councilwoman Rollinson, (Doc. 1, at ¶¶21, 23);

(2) "Towards the end of summer," Corporal Bifano told Mayor Millard and Councilman Bayly that things were "status quo" as it related to Police Chief Glavich's performance, (*Id*. ¶¶29–30);

3) Mayor Millard resigned in August 2015, (*Id*. ¶34);

4) During the Labor Day weekend in 2015,[4] Corporal Bifano was told he did not have authority to break-up a gathering and Police Chief Glavich accused him of talking behind his back, (*Id*. ¶¶35–36);

---

[4] The 2015 Labor Day holiday fell on Monday, September 7; thus, the Labor Day weekend spanned from September 5th to the 6th.

5) At a monthly meeting on September 8, 2015, the Borough and Police Chief Glavich held a closed-door, executive meeting with Patrolman Shaffer in attendance, (*Id*. ¶38–39, 41);

6) On September 9, 2015, the plaintiffs were informed that there was "insufficient funds for their continued service" and they were placed on unpaid leave, (*Id*. ¶¶42–43).

Although the complaint states that the plaintiffs' statements were first made in March 2015 and later confirmed towards the end of summer, the complaint does not state when Police Chief Glavich learned of these statements. It is plausible that he did not learn about the plaintiffs' statements until the summer. It was later during the Labor Day weekend that Police Chief Glavich allegedly lashed out at Corporal Bifano over the phone because of the statements. Because the court cannot speculate, the absence of a clear timeline might warrant dismissal with leave to amend. However, the other allegations in the complaint give rise to an inference of causation without the need to rely on a strict timeline of events.

If the timing alone is insufficient to show causation, the Third Circuit has recognized that "timing plus other evidence may be [the] appropriate] test." *Estate of Smith v. Marasco*, 318 F.3d 497, 513 (3d Cir. 2003). A plaintiff may use "evidence gleaned from the record as a whole" to show an inference of causation. *DeFlaminis*, 480 F.3d at 267. Such inference can be made when an employer gives inconsistent reasons for termination, *Waddell v. Small Tube Products, Inc.*, 799 F.2d 69, 73 (3d Cir.1986), engages in a series of

seemingly benign actions that essentially paved the way for an employee's termination, *Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d Cir. 1997), or attempts to provoke the employee by continually disciplining him for minor matters and miscalculating the amount of time he worked, *Robinson v. SEPTA*, 982 F.2d 892, 895 (3d Cir. 1993).

Here, the plaintiffs do not need to rely on a strict timeline of events to establish the requisite causal link. The harsh telephone call between Police Chief Glavich and Corporal Bifano a few days before the suspension could infer causation. The fact that the suspension coincided with the resignation of Mayor Millard who was investigating Police Chief Glavich's conduct might also infer causation. In addition, the false justification for the suspension—an alleged lack of funding despite there being sufficient funding—could infer causation. *See Waddell*, 799 F.2d at 73. If nothing else, cumulatively these facts set forth a plausible inference of causation, without the need to rely on temporal proximity alone. At a minimum, the court finds that the plaintiffs have pled sufficient facts to infer causation and reach the discovery phase. Thus, having already determined that the plaintiffs asserted sufficient facts to establish the protected speech requirement, the court finds that the plaintiffs have met their initial pleading burden and have stated a plausible First Amendment retaliation claim for speaking out against Police Chief Glavich's "on duty" conduct.

### iii.     *Police Chief Glavich's Assertion of Qualified Immunity*

Lastly, Police Chief Glavich argues that he is entitled to qualified immunity with respect to the plaintiffs' First Amendment claim against him individually.[5] The court agrees. The court's finding is based on the unique and unclear *Pickering* balancing that occurs in the law enforcement context as applied to the facts alleged in the plaintiffs' complaint.

The common law privilege of qualified immunity protects public officials who have undertaken discretionary acts from suit "to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway*, 510 U.S. 510, 514 (1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)); *Wright v. City of Phila.*, 409 F.3d 595, 599 (3d Cir. 2005) (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). It is "an immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). As such, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage of litigation." *Id*. (quoting *Hunter*, 502 U.S. at 227 (1991)).

---

[5] The plaintiffs' complaint caption does not explicitly state that Police Chief Glavich is being sued in his individual capacity and, instead, simply lists his name with an address. That address is different than the address listed for the Borough. Although it is unclear if the plaintiffs intended to sue Police Chief Glavich in his official or individual capacity, the court construes the plaintiffs' complaint to assert claims against Police Chief Glavich in his individual capacity alone, thus making qualified immunity arguments applicable.

District courts must use a two-prong test to analyze claims of qualified immunity. *Pearson*, 555 U.S. at 232; *Saucier v. Katz*, 533 U.S. 194, 201–02, *abrogated in part by Pearson*, 555 U.S. 223. Courts must determine if: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" and (2) "whether the right was clearly established." *Saucier*, 533 U.S. at 201; *Pearson*, 555 U.S. at 232; *Wright*, 409 F.3d at 600. If there was a violation of a constitutional right and the right was clearly established, then qualified immunity does not apply. Thus, the defendants may defeat a claim by establishing either prong of the analysis. Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case." *Pearson*, 555 U.S. at 236.

The court is unable to analyze the first *Saucier* prong at this stage of the litigation. The first prong requires that the court determine if the defendants violated the plaintiffs' First Amendment right to free speech by looking at the complaint alone. This determination will require a balancing of interests that the court in unable to undertake at this stage of the litigation as previously discussed. "The doctrine of constitutional avoidance counsels against unnecessarily wading into such muddy terrain." *Zaloga v. Borough of Moosic*, — F.3d —, 2016 WL 6156003, at *3 (3d Cir. Oct. 24, 2016). Trying to address the issue at this early stage would "be an essentially academic exercise" and

would also require that this court speculate on a myriad of factual matters. *Id*. (quoting *Pearson*, 555 U.S. at 237). Instead, the court finds qualified immunity is warranted based on the second *Saucier* prong.

A public official is entitled to qualified immunity if the constitutional right at issue was not clearly established. *Saucier*, 533 U.S. at 201. Before concluding that a clearly established right exists, "the court must define the right allegedly violated at the appropriate level of specificity." *Williams v. Bitner*, 455 F.3d 186, 191 (3d Cir. 2006). The "contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This does not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "In some cases, even though there may be no previous precedent directly on point, an action can still violate a clearly established right where a general constitutional rule already identified in the decisional law applies with obvious clarity." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012).

Here, it is incorrect to identify the right at issue as a public employee's right to be free from retaliatory actions for his or her speech. *Zaloga*, 2016 WL 6156003, at *3. More particularly, the plaintiffs were part-time police officers who spoke to the mayor and councilmembers about possible "waste and/or wrongdoing" stemming from their supervisor's improper "on duty" conduct.

29

The mayor was within their chain of command and the councilmembers were not. Construing the complaint in the plaintiffs' favor, these statements were not shown to be part of the plaintiffs' ordinary job responsibilities and plausibly implicated matters of public concern, as discussed above. However, the court has found no existing precedent to place the issues raised by the *Pickering* balancing beyond debate. Instead, many cases suggest that the *Pickering* analysis favors the government's interest in speech cases involving police departments. This is particularly true where the statements were made to those within the chain of command. Because of this, the court cannot conclude that the plaintiffs' First Amendment right is clearly established to the extent that a reasonable chief of police would understand the right.

In *Ober v. Evanko*, a nonprecedential opinion, the Third Circuit found that a police officers decision to violate an established department regulation and speak out against another employee outside the chain of command was not protected because the government's interest outweighed that of the officer. 80 F. App'x at 200–201. In *Ober*, the Third Circuit cited to a string of cases outside this circuit to suggest that the government has a greater interest and ability to regulate speech in the law enforcement context. *Id*. at 201. In fact, the Third Circuit noted that "[c]ourts have given law enforcement agencies wide latitude to regulate an employee's speech when that speech impacts areas such as discipline, morale, harmony, uniformity, and trust in the ranks." *Id*. The court ultimately found that the plaintiff officer had failed to

provide a "persuasive reason for circumventing the chain of command [established by the department's internal regulation]." *Id*. Other courts have reached similar conclusions. *See Persico v. City of Jersey City*, 67 F. App'x 669, 674 (3d Cir. 2003) (finding a police department's interest in maintaining rules and regulations outweighed the plaintiff officer's interest in free speech); *Citta v. Borough of Seaside Park*, Civ Action No. 09-865(FLW), 2010 WL 3862561, at *13–14 (D. N.J. Sept. 27, 2010) (same); *Hoffman v. Dougher*, Civ. Action No. 1:05-CV-0906, 2008 WL 148877, at *9–10 (M.D. Pa. Jan. 14, 2008) (recognizing the defendant police department's strong interest in regulating officer speech and declining to "resolve the delicate issue" of balancing that interest against the plaintiff's interest).

The finding in *Ober* does not end the issue. In *Ober*, the court did state that it would be "possible" to justify bypassing the chain of command "if the officer's superiors were reasonably suspected of wrongdoing." 80 F. App'x at 201. Also, in *Czurlanis v. Albanis*, the Third Circuit found that a chain of command policy that would require a public employee to report to the very person who the employee intended to speak out against could not be used to justify a retaliatory action. 721 F.2d 98, 105 (3d Cir. 1983). The court found that such a policy would impermissible chill protected speech. *Id*. The public employee speaking, however, was not a police officer. In addition, some court's have distinguished *Ober* where the plaintiff chose to speak in a public

forum, such as the news media. *See, e.g., Barry v. Luzerne County*, 447 F. Supp.2d 438, 447 (M.D. Pa. 2006).

The court is not prepared to engage in the fact and context specific *Pickering* analysis required to find an actual constitutional violation. However, it appears from the cases cited above that the *Pickering* analysis especially favors the defendant in the law enforcement context. *See Ober*, 80 F. App'x at 200–201. This is especially true where there is an actual rule or regulation in place regulating the officer's decision to speak.[6] *See id.* It may be less true where the officer intends to speak out against the person he or she is expected to report to. *See Czurlanis,* 721 F.2d at 105. The Third Circuit's statement in *Ober* suggesting that the balancing test might "possib[ly]" favor the employee if a superior is suspected of wrongdoing does not give the court real clarity. 80 F. App'x at 201. At the very least, the outcome of the balancing text is unclear where it involves subordinate officers and their supervisors.

In light of the unique *Pickering* balancing in the law enforcement context, it is not clear that a reasonable chief of police would understand that suspending a subordinate officer when that officer goes above the chief's

---

[6] The defendants have not alleged any actual rule or regulation that made the plaintiffs' speech impermissible and further discovery would ultimately reveal if this is the case. The court simply notes that this is one factor that would have to play out in the eventual balancing, making the ultimate outcome under *Pickering* unclear, with or without an actual rule.

head and speaks to the mayor and councilmembers violates the First Amendment. The plaintiffs chose to speak to the mayor, within their chain of command, and the Borough's councilmembers, outside the chain of command. They did not go to the media or a news outlet or provide testimony in an ongoing investigation. Doing so might have placed the *Pickering* balance in a clearer state. See *Barry*, 447 F. Supp.2d at 447; *Lane*, 134 S. Ct. at 2380. The allegations against Police Chief Glavich also do not present an instance where the allegations are so egregious that "a stronger showing [of government interests] may be necessary." *Lane*, 134 S. Ct. at 2381 (quoting *Connick*, 461 U.S. at 152) (alteration in original). Thus, even though going over Police Chief Glavich's head may have been justified, this is unclear based on the strength of the department's underlying interest.

Reviewing the cases above, the constitutional question is not "beyond debate," *Ashcroft*, 563 U.S. at 741, and there is no "obvious clarity" in the law, *Sharp*, 669 F.3d at 159. Having recognized the complexity and lack of clarity of the *Pickering* analysis in the law enforcement context now, allowing the claim against Police Chief Glavich to proceed to discovery would obliterate the protection that qualified immunity was intended to provide. The plaintiffs' First Amendment rights in this case are not clearly established as required by the second *Saucier* prong and Police Chief Glavich is entitled to qualified immunity. Accordingly, the First Amendment claim against Police Chief Glavich in his individual capacity is dismissed with prejudice.

### B. The Plaintiffs' Whistleblower Claim—Count I

In Count I of the complaint, the plaintiffs allege that they were retaliated against by the defendants for making good faith reports of wrongdoing or waste by Police Chief Glavich, a violation of Pennsylvania's Whistleblower Law, 43 PA. STAT. ANN. §1421 *et seq*. The defendants argue that the complaints made by the plaintiffs about Police Chief Glavich do not amount to waste or wrongdoing as defined by Pennsylvania law and are, therefore, not protected by the Pennsylvania statute. They also argue that, like the First Amendment claim, there is an insufficient inference of causation between the plaintiffs' statements and the defendants' actions. The court finds the plaintiffs have asserted a plausible claim for reporting waste under Pennsylvania's Whistleblower Law, but agrees with the defendants that the plaintiffs have failed to establish a claim for reporting wrongdoing.

Pennsylvania's Whistleblower Law makes it unlawful for public bodies or those receiving money from public bodies to retaliate against employees for reporting wrongdoing or waste, providing as follows:

> No employee may discharge, threaten or otherwise discrimination or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act.

43 PA. STAT. ANN. §1423(a); *see also* §1422 (defining an "employer"). To assert a *prima facie* case under the law an employee must show that he or she "reported or was about to report in good faith, verbally or in writing, an instance of wrongdoing or waste to the employer or an appropriate authority," before the alleged retaliation occurred. 43 PA. STAT. ANN. §1424(b); *see also O'Rourke v. Commonwealth*, 778 A.2d 1194, 1200 (Pa. 2001). The employee must also show causation or some connection between the employee's report and the alleged retaliatory act(s). *O'Rourke*, 778 A.2d at 1200; *Golaschevsky v. Dep't of Envtl. Protection*, 720 A.2d 757, 759 (Pa. 1998).

I.    *The Plaintiffs' Claim of Waste*

The plaintiffs' have made a sufficient claim for reporting waste. "Waste" is defined as "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources." 43 PA. STAT. ANN. §1422. Explicitly, whatever actions are reported by the employee, those actions must result in "abuse, misuse, destruction or loss of funds or resources." *Id*. The result or effect of the conduct must be "substantial." *Id*. Thus, under a plain reading of the statute, an employer may be held accountable not only for the substantial destruction and/or loss of funds or resources, but also for substantial abuse and/or misuse of those funds and

resources.[7] This language is sufficiently broad to encompass a wide variety of alleged misconduct.

In *Bennett v. Republic Services, Inc.*, the Eastern District of Pennsylvania found that a single instance of a supervisor improperly clocking in and receiving wages while not actually working did not constitute waste under the statute. 179 F. Supp.3d 451, 455–56 (E.D. Pa. 2016). Although the plaintiff had alleged that those instances may have occurred more than once, the court dismissed these allegations as purely speculative. *Id*. In contrast, the Pennsylvania Supreme Court found that a report of the public defendant entering into fixed-price contracts could constitute waste, indicating the various ways such a contract could lead to the loss of money. *Bailets v. Pa. Turnpike Comm'n*, 123 A.3d 300, 308 (Pa. 2015). The Pennsylvania Supreme Court appeared to engage in a broad reading of the statute to reach this conclusion. *See id*.

Construing the complaint in the plaintiffs' favor, the court finds that the series of allegations against Police Chief Glavich cumulatively amount to a plausible claim for reporting waste. The plaintiffs allege that Police Chief Glavich *frequently* sat in the office (1) "in plain clothing"; (2) "with his personal vehicle outside and/or without [a] police vehicle available"; (3) "avoid[ing]

---

[7] 1 PA. CONS. STAT. ANN. §1903(a) ("Words or phrases shall be construed according to rules of grammar and according to their common and approved usage," unless technical in nature.)

36

telephone calls"; and (4) "at times, would avoid citizen complaints attempted in person," during times he was billing the Borough for his services as police chief. (Doc. 1, at ¶¶16–17). As explained previously, these factual statements amount to an allegation that Police Chief Glavich was billing the Borough despite not performing his work duties.

The plaintiffs' allegations here are not comparable to those made in *Bailets*, but they are more substantial than the allegations made in *Bennett*. Compensating Police Chief Glavich for unperformed services over a period of approximately four and a half years[8] does amount to a plausible claim of waste under an abuse or misuse of funds theory. If it is proven true that Police Chief Glavich was not actually working—particularly by avoiding calls and avoiding citizen complaints—while billing the Borough for his services, his billing would certainly be improper and could constitute substantial abuse or misuse of funds under a broad reading of the Pennsylvania statute. As such, the plaintiffs' have stated a plausible claim of reporting waste and the defendants motion is denied as it relates to this claim.

---

[8] The complaint alleges that Police Chief Glavich accepted his role as chief of police in October of 2010 and the plaintiffs first complaint regarding his behavior was in March of 2015. (Doc. 1, at ¶¶13, 21).

### ii.    *The Plaintiffs' Claim of Wrongdoing*

Although the plaintiffs have asserted a plausible claim using a waste theory, they have not asserted a plausible claim of reporting wrongdoing. The Whistleblower Law defines "wrongdoing" as "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer." 43 PA. STAT. ANN. §1422. "Wrongdoing includes not only violations of statutes or regulations that are of the type that the employer is charged to enforce, but violations of any federal or state statute or regulation, other than violations that are of a merely technical or minimal in nature". *Golaschevsky*, 720 A.2d at 759. The plaintiffs' complaint does not allege that Police Chief Glavich or the Borough violated any of the following: a federal or state statute; a federal or state regulation; a subdivision ordinance; a code of conduct; or a code of ethics. Assessing the plain language of the statute, this failure is fatal to the plaintiffs' claim under a wrongdoing theory. Although one court has found that a failure to state what law or code was violated was not fatal to a claim at the initial pleading stage, the court disagrees. *See Bielewicz v. Penn-Trafford Sch. Dist.*, Civ. Action No. 10-1176, 2011 WL 1486017, at *5 (W.D. Pa. Feb. 9, 2011). Not advising the court what law or code Police Chief Glavich allegedly violated would require this court to speculate on the plaintiffs' claim. The right to relief must be beyond the speculative level.

Nonetheless, the court cannot definitively determine that the plaintiffs' claim is futile under a wrongdoing theory. *See Alston*, 363 F.3d at 236. Though speculative, it is possible that Police Chief Glavich's improper billing to the Borough and his avoidance of telephone calls and citizen complaints while on duty violated some statute, regulation, ordinance, or code of conduct or ethics. The plaintiffs should identify such law if choosing to amend their claim. Accordingly, the court will grant leave to the plaintiffs to amend their whistleblowing claim using a wrongdoing theory if they so choose.

### iii.   *Causation Under the Whistleblower Law*

Briefly addressing the defendants' causation argument, the court finds that it is lacking. The plaintiffs' whistleblower claim requires that they show some connection between their report of waste and the retaliatory acts taken against them. *O'Rourke*, 778 A.2d at 1200; *Golaschevsky v. Dep't of Envtl. Protection*, 720 A.2d 757, 759 (Pa. 1998). This requires pleading facts or surrounding circumstances that support an inference that the employee's report ultimately led to the retaliation—i.e. causation. *See Golaschevsky*, 720 A.2d 757, 759 (Pa. 1998). The same reasoning that supports an inference of causation in the First Amendment retaliation context applies with equal force in the whistleblower context. *See Boyer v. City of Phila.*, Civ. Action No. 13-6495, 2015 WL 9260007, at *7 (E.D. Pa. Dec. 17, 2015) ("Causation under the Whistleblower Law is proved in the same way as under Title VII and

§1983."). The court has already addressed the defendants' causation argument as it relates to the plaintiffs' First Amendment claim, a Section 1983 claim.[9] The court makes the same finding as it relates to the plaintiffs' whistleblower claim and finds the complaint sufficient to assert an inference of causation.

Accordingly, the defendants' motion is denied to the extent is seeks dismissal of the plaintiffs' whistleblower claim under a waste theory and granted to the extent it seeks dismissal of the plaintiffs' whistleblower claim under a wrongdoing theory. The plaintiffs' claim asserting a violation of Pennsylvania's Whistleblower Law under a wrongdoing theory is dismissed without prejudice. The plaintiffs are granted leave to amend this claim if they so choose.

## C. The Plaintiffs' Defamation Claim—Count III

In Count III of the complaint, the plaintiffs allege that Police Chief Glavich defamed them by telling the Borough's councilmembers that they violated the chain of command. In addition, Sergeant Rynearson alleges that Police Chief Glavich defamed him, specifically, by telling the chief of police of the nearby Forest City police department that he violated the chain of command. Police Chief Glavich argues that the alleged statements are

---

[9] *See supra*, part IV.A.ii. (discussing the facts alleged by the plaintiffs that support an inference of causation).

incapable of defamatory meaning, that the statements were true, and that any statement made to the Forest City police chief was conditionally privileged. In the alternative, Police Chief Glavich argues that his statements are shielded by the Political Subdivision Tort Claims Act ("PSTCA"), 42 PA. CONS. STAT. ANN. §8541 *et seq*. Again viewing the complaint in the plaintiffs' favor, the court finds that the plaintiffs have sufficiently pled a defamation claim against Police Chief Glavich.

Police Chief Glavich allegedly told the Borough's councilmembers "and others" that the plaintiffs were violating the chain of command. (Doc. 1, at ¶107). The plaintiffs do not allege when these statements occurred, but the plaintiffs do state that during the October 20, 2015 meeting with the Borough's councilmembers and solicitor there was a "hostile confrontation" where they were accused of "[c]hain-of-[c]ommand violations." (*Id*. ¶¶49–50). Thus, the statement must have been made to them before this time. This meeting was held after the plaintiffs' suspension and was scheduled to discuss their continued employment as officers with the Borough. Assuming Police Chief Glavich was the one who told the councilmembers that the plaintiffs "violated the chain of command," as the plaintiffs suggest, it is plausible that the statement was defamatory in this context. The same can be said about Police Chief Glavich's statement to the Forest City chief of police that Sergeant Rynearson violated the chain of command.

Under Pennsylvania law, a plaintiff must establish seven elements in a defamation claim, including "[t]he defamatory character of the communication." 42 PA. CONS. STAT. ANN. §8343(a). The defamatory character of a statement is an initial question for the court. *Burton v. Teleflex Inc.*, 707 F.3d 417, 434 (3d Cir. 2013); *Tucker v. Philadelphia Daily News*, 848 A.2d 113, 123–124 (Pa. 2004); *MacElree v. Philadelphia Newspapers, Inc.*, 674 A.2d 1050, 1053 (Pa. 1996). A statement is defamatory if it "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third parties from associating or dealing with him." *Tucker*, 848 A.2d at 124 (quoting Restatement (First) of Torts §559 (1938)). The statement must be examined in context and a court "should evaluate the effect [the statement] is likely to produce in the minds of the average persons among whom it is intended to circulate." *Burton v. Teleflex Inc.*, 707 F.3d 417, 434 (3d Cir. 2013) (internal quotation marks omitted); *see also Wendler v. DePaul*, 499 A.2d 1101, 1103 (Pa. Super. Ct. 1985). Thus, "[a] critical factor in determining whether a communication is capable of defamatory meaning . . . is the nature of the audience hearing the remarks." *Baker v. Lafayette Coll.*, 532 A.2d 399, 402 (Pa. 1987).

Here, Police Chief Glavich's statements that the plaintiffs "violated the chain of command" are capable of defamatory meaning when viewed in their factual context. A violation is defined as "[t]he act of breaking or dishonoring the law; the contravention of a right or duty." BLACK'S LAW DICTIONARY 712

(10th ed. 2014). As a police officer—one who is charged with enforcing the law—a violation of any command can have special import reflecting on the officer's fitness to enforce rules and regulations for the community. The statement did not merely criticize the plaintiffs in their work performance. Instead, it was a statement of fact suggesting that the plaintiffs dishonored or broke the rules in bypassing the chief of police and going to the mayor directly.

In this case, the intended audience for the statement included the Borough's councilmembers who were in the process of determining whether the plaintiffs were fit to continue employment with the police department. The statement likely cast a poor light on the plaintiffs' ability to continue employment as officers charged with enforcing the law. Thus, the statement likely held great weight when it was mentioned during the October 20, 2015 meeting scheduled to discuss the plaintiffs' suspension. In this context, the statement was capable of defamatory meaning.

The statement made to the Forest City chief of police was also capable of being defamatory for similar reasons as those above. The statement about Sergeant Rynearson was made during a time when the plaintiffs were seeking employment in other, nearby police departments. In that context, the statement likely cast a poor light on Sergeant Rynearson's ability to follow rules and was, therefore, capable of defamatory meaning.

43

Next, Police Chief Glavich asserts the defense of truth and asserts that a conditional privilege exists as it relates to the statements made to the Forest City chief of police. If a plaintiff is able to establish the required elements of a particular defamation claim, the statute provides three defenses. *See* 42 PA. CONS. STAT. ANN. §8343(b). These defenses include: proving the truth of the statement; asserting a privilege; and showing the statement relates to a matter of public concern. *Id*. None of these clearly apply at this stage.

A conditional privilege applies to statements "whenever a prior employer evaluates a former employee at the request of a prospective employer." *Zuschek v. Whitmoyer Labs., Inc.*, 430 F. Supp. 1163, 1165 (E.D. Pa. 1977). Police Chief Glavich's argument that any statements made to the police chief of Forest City are protected by a conditional privilege misreads the allegations in the plaintiffs' complaint. Sergeant Rynearson has explicitly alleged in the complaint that the statement made to the police chief of Forest City was "not requested but [was] made voluntarily in an effort to harm [him]." (Doc. 1, at ¶111). The court must accept this allegation as true at this stage of the proceedings. Thus, there was no "request" from a prospective employer—the Forest City police department in this case. *Zuschek*, 430 F. Supp. at 1165. As such, the court cannot dismiss the defamation claim brought by Sergeant Rynearson on the grounds of a conditional privilege at this time.

The court also cannot safely determine that the statements made by Police Chief Glavich were true. As explained previously, to state that the

44

plaintiffs "violated" the chain of command implies that they broke or dishonored the rules set forth by the chain of command. Looking at the complaint, and the defendants' own argument, there was no rule, duty, or procedure that required the plaintiffs to speak with Police Chief Glavich *before* approaching the mayor. Instead, the defendants cite to Sections 1123, 1123.1 of Pennsylvania's Borough Code. Those provisions provide that the mayor has full control over the police force and that he may delegate powers to the chief of police or other supervisory officers. 8 PA. CONS. STAT. ANN. §§1123–1123.1. Those provisions do not state how subordinate officers should express grievances or concerns. Thus, it is a mischaracterization to state that the plaintiffs violated the chain of command when looking at those provisions alone. Those provisions do not establish a "violation" of any rule. Further discovery will reveal if such a rule actually existed, but the statute alone is insufficient to make that finding. Thus, at this stage, whether the plaintiffs "violated" the chain of command is arguable.

Addressing Police Chief Glavich's final argument, the court finds that his conduct is not immunized by the PSTCA. Section 8541 of the PSTCA provides that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." The PSTCA clearly applies to "local agenc[ies]" or municipal defendants. *Id.*; *see also Roskos v. Sugarloaf Twp.*, 295 F. Supp. 480 (M.D. Pa. 2003) (dismissing a defamation claim against

municipal defendants under the PSTCA, but not the individual defendant). As interpreted by the court, the plaintiffs have sued Police Chief Glavich in his individual capacity. The plaintiffs did not bring a defamation claim against the Borough. Thus, this claim was not brought against any "local agency." *Id*. Accordingly, the PSTCA does not apply. As such, the plaintiffs have asserted a sufficient defamation claim to proceed with litigation and the motion is denied to the extend is seeks dismissal of Count III of the complaint.

## V.    CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss the plaintiffs' complaint under Rule 12(b)(6) is **GRANTED IN PART and DENIED IN PART**. The defendants' request to dismiss the plaintiffs' First Amendment retaliation claim (Count II) is granted and denied in part. The motion is **DENIED** to the extent it seeks dismissal of the claim against the Borough based on Police Chief Glavich's "on duty" conduct. The motion is **GRANTED** to the extent it seeks dismissal of a claim against the Borough based on Police Chief Glavich's purchase of equipment for the department. The plaintiffs' reporting of this conduct does not plausibly state a First Amendment claim and any claim founded on such conduct is **DISMISSED WITH PREJUDICE**. The motion is **GRANTED** to the extent it seeks dismissal of the First Amendment retaliation claim against Police Chief Glavich in his

individual capacity. Police Chief Glavich is entitled to qualified immunity and the First Amendment claim against him is **DISMISSED WITH PREJUDICE**.

The defendants' request to dismiss the plaintiffs' Pennsylvania Whistleblower claim (Count I) is also granted and denied in part. The motion is **DENIED** to the extent is seeks dismissal of the plaintiffs' whistleblower claim under a waste theory and **GRANTED** to the extent it seeks dismissal of the plaintiffs' whistleblower claim under a wrongdoing theory. The plaintiffs' claim asserting a violation of Pennsylvania's Whistleblower Law under a wrongdoing theory is **DISMISSED WITHOUT PREJUDICE** and the plaintiffs are granted leave to amend this claim, if they so choose.

Finally, the Police Chief Glavich's request to dismiss the plaintiffs' defamation claim (Count I) is **DENIED**. In making the above determinations the court has declined to consider the letter attached to the defendants' motion as an exhibit. A separate order shall issue.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: December 22, 2016**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2016 MEMORANDA\16-0245-01.wpd

47